UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | Cause No. 1:23-CR-58-HAB |
| ) | |
| PETRU-RAZVAN BRUMA ) | |
| ) | |

**OPINION AND ORDER**

Petru-Razvan Bruma ("Bruma"), a suspected fraudster, is charged with bank fraud and possession of a shimming device[1] in a two-count federal indictment. (ECF No. 13). On October 4, 2023, law enforcement pulled Bruma over for speeding. The traffic stop ultimately ended in Bruma's arrest. He contends that the 42-minute seizure amounted to an arrest from the start, that officers unreasonably extended the stop's duration, and that officers lacked probable cause to arrest him. (ECF Nos. 50, 67). The Court held an evidentiary hearing on these issues on June 11, 2024.[2] (ECF No. 46). For the reasons below, Bruma's Motion to Suppress (ECF No. 32) will be DENIED.

**FACTUAL BACKGROUND**

On October 3, 2023, a Flagstar Bank technician noticed what he believed to be a shimming device hanging out of an ATM at West Jefferson Boulevard in Fort Wayne, IN ("West Jefferson ATM"). (ECF No. 48 at 114-15). The technician waited by the ATM until FBI Task Force Officer Roy Stuckey ("TFO Stuckey") arrived at the scene. (*Id.*). When TFO Stuckey arrived, he noticed the shimmer partially pulled out of the ATM's card reader slot and an external camera on the

---

[1] A shimming device, or shimmer, is a device used to scan the financial data from debit or credit cards to obtain the card owners' financial data.
[2] Bruma, in his Reply Brief (ECF No. 67), requests a supplemental evidentiary hearing so that he may cross examine the officers. Yet he provides no basis for a supplemental hearing except that he is now proceeding pro se. Without any indication as to what additional facts a supplemental hearing may elucidate, the Court denies his request.

outside of the ATM. (*Id.* at 116-17). The same day, TFO Stuckey reviewed a video and still images from the West Jefferson ATM's security footage. (*Id.* at 118-122; ECF No. 47, Exhibits 3-8).

At the evidentiary hearing, TFO Stucky testified that the device placed on the West Jefferson ATM was a camera manufactured to look like it belonged on the ATM. (*Id.* at 121-22). Government's Exhibit 4 was one of the still images that TFO Stuckey reviewed—a picture of a Chevy vehicle coming into the ATM's view. (*Id.* at 119). From this image, law enforcement determined that the vehicle was a gray Chevy Malibu with a New York license plate bearing "KBU3496." (*Id.* at 122-23). TFO Stuckey thought that the vehicle looked tan but appeared to change color based on the lighting. (*Id.* at 123). The description TFO Stuckey relayed to other law enforcement officers was that of a gray or tan Chevy Malibu with the distinct New York license plate. (*Id.*). The suspect was wearing a white t-shirt, sunglasses, a face mask, and a hat with the Chicago flag on it.

Later that evening, TFO Stuckey was again contacted by Flagstar Bank because it found another device on its ATM near Maplecrest Road ("Maplecrest Road ATM"). (*Id.* at 124). Flagstar Bank again provided still images and the video from their surveillance at the Maplecrest Road ATM. (*Id.*). TFO Stuckey testified that it was the same Chevy Malibu with the same sole occupant placing the shimming device on the ATM. (*Id.* at 128).

On October 4, 2023, Fort Wayne Police Department Detective John Greenlee ("Detective Greenlee") and other narcotics units were asked to help surveil a brown Chevy Malibu with an out-of-state license plate heading west from Chicago into Allen County. (*Id.* at 5-6, 45-46). Detective Greenlee took over following the Chevy Malibu as it entered Allen County and noted the New York license plate with the number "KBU3496." (*Id.* at 6-7). He also noticed that the driver, a dark-haired male, was the sole occupant. (*Id.* at 7). Detective Greenlee observed the

2

Malibu drive to a shopping plaza where the West Jefferson ATM is located. (*Id.* at 8-9). He lost sight of the Malibu as it left the shopping plaza, but other officers maintained surveillance. (*Id.*) Detective Greenlee eventually landed behind the Malibu again and followed the driver to a shopping center where the Maplecrest Road ATM is located. (*Id.*).

Fort Wayne Police Department Detective Michael Meraz ("Detective Meraz") picked up surveillance and, at one point followed directly behind the Malibu, to confirm the license plate. (*Id.* at 20, 27). He observed the Malibu pull up to the Maplecrest Road ATM. (*Id.* at 20-21). From his position, Detective Meraz could see the driver get out of the car and walk up to the ATM for two to three minutes. (*Id.* at 21, 23). The driver then got back into the empty vehicle and drove away. (*Id.* at 23).

Detective Greenlee ended up back behind the Malibu after it left the Maplecrest Road ATM. (*Id.*). At one point while following the Malibu, he noticed that it was traveling at 67 miles per hour in a 50 mile per hour zone. (*Id.* at 10-11). He called this out to other officers in the area, and a uniformed police officer pulled the Malibu over. (*Id.*). Detective Greenlee did not participate in the traffic stop. (*Id.* at 10-11).

The officer that pulled the Malibu over was Fort Wayne Police Department Officer Ryan Nystuen ("Officer Nystuen"). Earlier that day, Officer Nystuen assisted with surveillance of the Malibu too. (*Id.* at 92). He was following the Malibu when Detective Greenlee called out the traffic violation, confirmed that the Malibu was traveling between 65 and 75 miles per hour, and pulled the Malibu over. (*Id.* at 96-97).

Officer Nystuen approached the driver side door where he encountered Bruma dressed in a white t-shirt, jeans, and a hat. (*Id.* at 97). Bruma provided Officer Nystuen with a driver's license and a passport—both from the United Kingdom—and an empty envelope from the rental company

3

that owned the Malibu. (*Id.* at 99-100). Officer Nystuen returned to his vehicle and attempted to run the license through the state and federal BMV databases, but no information came back. (*Id.*). Nor was dispatch able to find any information when Officer Nystuen requested that they run the license. (*Id.*).

Officer Nystuen then called the rental company to determine whether Bruma was rightfully in possession of the Malibu. (*Id.* at 100). When nobody picked up from the phone number on the envelope, he called the company at the Fort Wayne airport. (*Id.*). It took about 10 to 15 minutes before he spoke to a rental company representative. (*Id.* at 100-01). Officer Nystuen then verified that Bruma rented the Malibu, but the rental company would not provide information about when he rented it. (*Id.*).

FBI Task Force Officer Michael Long ("TFO Long") was also present and assisted during the traffic stop. (*Id.* at 98). TFO Long knew from TFO Stuckey that the Malibu was suspected of being involved in the ongoing shimmer investigation. (*Id.* at 45). When TFO Long arrived at the traffic stop, Officer Nystuen was already talking with Bruma on the driver's side of the vehicle. (*Id.* at 32). Officer Long's body camera captured the events during the stop. (ECF No. 48, Exhibit 15).

Shortly after TFO Long reached the passenger side of the Malibu, Officer Nystuen went back to his vehicle and TFO Long started talking with Bruma. (*Id.* at 01:25-02:30). Bruma told TFO Long that he was heading to Chicago. (*Id.*). When asked where he was coming from that evening, Bruma said that he was visiting some friends in Ohio. (*Id.*). Bruma then informed TFO Long that he lives in Los Angeles. (*Id.*).

After a few minutes of small talk, Officer Nystuen returned to the Malibu and collected Bruma's UK driver's license, UK passport, and the rental company envelope. (*Id.* at 04:25-05:40).

4

TFO Long and Officer Nystuen left Bruma in the Malibu, with TFO long expressing concerns that Bruma's documents might be fake. (*Id.*). By this time, TFO Stuckey was also present and TFO Long approached him to discuss the investigation. (*Id.*).

TFO Long immediately told TFO Stuckey that "it looks like him" in reference to the person placing shimmers at the West Jefferson ATM. (*Id.* at 05:40-07:05). He also told TFO Stuckey that Bruma was wearing a dark hat with a patch and stars on it, but could not discern if it was the Chicago flag or not. (*Id.*). They discussed Bruma's statements about his whereabouts that evening. (*Id.* at 06:00). TFO Long and TFO Stuckey realized that Bruma's "story [was] not matching up" and that "he lied." (*Id.*). Indeed, surveillance watched the Malibu during its entire trip through Fort Wayne; Bruma was not coming from Ohio.

TFO Long said to TFO Stuckey that, in his opinion, they had probable cause to search the Malibu even without Bruma's consent. (*Id.*). Still, TFO Stuckey told TFO Long to ask for consent and, if Bruma denied consent, then he too believed that there was probable cause to search the vehicle. (*Id.*). TFO Stuckey also suggested that if Bruma was not on the rental car agreement, then officers could tow the car and conduct an inventory search. (*Id.*). TFO Long indicated that an inventory search might not be helpful as he saw nothing in plain view. (*Id.*).

TFO Stuckey said that he would pull up some pictures from the West Jefferson ATM's surveillance to compare with Bruma. (*Id.* at 07:05-11:40). TFO Stuckey then told TFO Long to make Bruma think that he was on a traffic stop. (*Id.*). If TFO Long could not obtain consent, the plan was to "just pull him out and detain him and go that route." (*Id.*) TFO Long briefly spoke with Officer Nystuen about Bruma's identification and returned to TFO Stuckey to provide Bruma's name, so TFO Stuckey could see if it matches anything in law enforcement's system.

5

(*Id.*). TFO Stuckey and TFO Long briefly discussed Bruma's documentation before TFO Long returned to Officer Nystuen's car. (*Id.*).

TFO Long informed Officer Nystuen that he planned to speak with Bruma and asked who the Malibu is rented to. (*Id.* at 11:47-13:15). Unable to verify that information from the rental envelope, TFO Long returned to the Malibu to ask Bruma if he had any other documents for the Malibu. (*Id.*). When asked, Bruma handed TFO Long a stack of papers. (*Id.* at 13:15-15:15). The paperwork did not indicate who rented the Malibu but did include the Malibu's registration. (*Id.*) TFO Long informed Bruma that there were concerns as to who is in rightful possession of the Malibu and gave the registration to Officer Nystuen. (*Id.*).

TFO Long suggested that Officer Nystuen call the rental company to confirm that Bruma was the renter. (*Id.* at 15:23-17:00). Meanwhile, TFO Long checked the VIN number on the Malibu to confirm that it matches the registration before returning to speak with TFO Stuckey. (*Id.*). TFO Long informed TFO Stuckey that Officer Nystuen was verifying Bruma's information with the rental company. (*Id.* at 17:00-18:07). And they discussed the photographs from the West Jefferson ATM's surveillance. (*Id.*) TFO Long then asked TFO Stuckey what an Assistant United States Attorney ("AUSA") said about the situation and if they "[were] going to detain either way." (*Id.* at 18:07-18:50). TFO Stuckey responded, "no." (*Id.*). TFO Long disagreed, mentioning that Bruma went to both the West Jefferson ATM and the Maplecrest Road ATM earlier in the day, came all the way from Chicago, and lied about his travels. (*Id.*).

TFO Long then expressed his concern that if they don't detain him, Bruma would be gone. (*Id.* at 18:50-19:00). TFO Stuckey called the AUSA to discuss how officers should proceed and the AUSA indicated that she was not sure what to do. (*Id.* at 19:40-20:20). After the call, TFO Long returned to Officer Nystuen's car briefly before going to Bruma and informing him that

6

Officer Nystuen was on the phone with the rental company. (*Id.* at 20:20-22:05). Bruma started to discuss conspiracy theories with TFO Long. (*Id.* at 22:05-29:10).

After seven minutes of conspiracy discussion, Officer Nystuen approached the Malibu and told Bruma that he contacted the rental company and that Bruma was on the contract. (*Id.* at 29:10-30:27) Officer Nystuen also informed Bruma that he was stopped for speeding. (*Id.*). Officer Nystuen and TFO Long then started talking at the rear of the Malibu. (*Id.* at 30:27-30:48). When Officer Nystuen said he only had enough information to conduct a consensual search, TFO Long responds, "let's just pull him out, give him his stuff back and we'll ask [for consent]." (*Id.*).

Officer Nystuen and TFO Long approached Bruma again and asked him to step outside the vehicle. (*Id.* 30:48-32:35). Bruma refused and stayed in the Malibu. (*Id.*). Officer Nystuen informed Bruma that the traffic stop had concluded and asked for consent to search the car. (*Id.* at 32:35-32:45). Bruma denied consent. (*Id.*). Officer Nystuen then returned Bruma's documents and explained the traffic citation for a few minutes. (*Id.* at 32:45-34:00). TFO Long asked Bruma to stay for a moment and proceeded to speak with TFO Stuckey away from the Malibu. (*Id.* at 34:00-34:15).

TFO Long told TFO Stuckey that Bruma denied consent. (*Id.* at 34:15-36:00). TFO Long and TFO Stuckey again discussed the comparison between Bruma and still images from the West Jefferson ATM on TFO Stuckey's phone. (*Id.*). From the "grainy" photographs, TFO Stuckey believed that the suspect might have a tattoo on his forearm. (*Id.*). TFO Long questioned that the image depicted a tattoo and thought that it could just be hair piling up. (*Id.*). TFO Long also mentions that there is a dot between the suspect's eyes. (*Id.*). Even so, TFO Long thought that the suspect was Bruma. (*Id.*)

7

TFO Long returned to the Malibu and confirmed that Bruma does not have a tattoo on his arm. (*Id.* at 36:00-36:16). TFO Long then told Bruma to step out of the vehicle and took him to the rear of the Malibu where Bruma met TFO Stuckey for the first time. (*Id.* at 36:16-37:00). TFO Stuckey informed Bruma that officers had been following him all night and asked why he was driving around Fort Wayne looking at ATMs. (*Id.* at 37:00-39:45). After comparing the West Jefferson ATM's surveillance photos with Bruma, TFO Stuckey stated, "yeah that's him" and Bruma was placed in handcuffs. (*Id.* at 39:45-41:00).

## DISCUSSION

### I.   Legal Standard

The Fourth Amendment protects the right of "the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. When police officers stop a vehicle and detain its occupants briefly, the stop amounts to a seizure under the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 809-10 (1996).

To justify a brief investigatory stop, officers must be "able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio*, 392 U.S. 1, 21 (1968). "A *Terry* investigative stop is 'a brief detention which gives officers a chance to verify (or dispel) well-founded suspicions that a person has been, is, or is about to be engaged in criminal activity.'" *United States v. Bullock*, 632 F.3d 1004, 1014-15 (7th Cir. 2011) (quoting *United States v. Vega*, 72 F.3d 507, 515 (7th Cir. 1995)). We analyze reasonable suspicion under the totality of the circumstances, and it requires "'more than a hunch but less than probable cause and considerably less than preponderance of the evidence.'" *Gentry v. Siever*, 597 F.3d 838, 845 (7th Cir. 2010) (quoting *Jewett v. Anders*, 521 F.3d 818, 823-25 (7th Cir. 2008).

8

One of three things must happen during a *Terry* stop: "(1) the police gather enough information to develop probable cause and allow for continued detention; (2) the suspicions of the police are dispelled and they release the suspect; or (3) the suspicions of the police are not dispelled, yet the officers have not developed probable cause but must release the suspect because the length of the stop is about to become unreasonable." *United States v. Reedy*, 989 F.3d 548, 553 (7th Cir. 2021) (quoting *United States v. Leo*, 792 F.3d 742, 751 (7th Cir. 2015)). To be constitutional, the investigation following the stop must be reasonably related in scope and duration to the circumstances that justified the stop in the first place. *Id.* at 552. A *Terry* stop cannot continue indefinitely and "a stop lasting too long becomes a 'de facto arrest that must be based on probable cause.'" *Id.* (quoting *Bullock*, 632 F.3d at 1015).

"Probable cause to arrest [*i.e.*, probable cause for an unreasonable seizure claim] exists when the facts and circumstances that are known to the officer reasonably support a belief that the individual has committed, is committing, or is about to commit a crime." *Braun v. Vill. of Palatine*, 56 F.4th 542, 548 (7th Cir. 2022) (cleaned up). With these standards in mind, the Court turns to its analysis.

## II.   Analysis

Bruma asks this Court to suppress all evidence seized from the October 4, 2023, investigative stop and any statements made during his arrest because: (1) "the stop of Bruma was an arrest from the very beginning"; (2) "the seizure that was justified by issuing a traffic ticket for speeding" was unreasonably prolonged; and (3) there was no probable cause to arrest him. (ECF Nos. 50, 67). The Court will address each argument in turn.

### a.  The Stop of Bruma was not an Arrest From the Very Beginning.

At the outset, Bruma was not arrested until the end of the encounter when TFO Stuckey made his identification. In *United States v. Rodriguez*, 831 F.2d 162, 166 (7th Cir. 1987), the Seventh Circuit identified several factors relevant in determining whether a *Terry* stop amounts to an arrest: (1) the officers' intent in stopping the car; (2) whether there was a search; (3) whether or how much questioning occurred; (4) whether there was a show of force; and (5) whether the person stopped could be said to have been taken into custody. These factors plainly do not support Bruma's contention that he was arrested from the start of the stop.

The majority of Bruma's argument on this point focuses on the first factor—officer intent. Bruma points out that TFO Stuckey and TFO Long "discussed 'detaining'" him. (ECF No. 50 at 17-18). About 7 minutes into the traffic stop, TFO Long approached TFO Stuckey and asked if he wanted to pull Bruma out of the vehicle or if TFO Stuckey wanted to see Bruma. (ECF No. 48, Exhibit 15 at 05:30-07:30). TFO Long can be heard saying, "it looks like him[,]" in reference to the suspect who placed the shimmers on ATMs. (*Id.*). TFO Stuckey said he wanted to pull some pictures up to compare with Bruma. (*Id.*). Meanwhile, TFO Stuckey advised TFO Long to make Bruma think he is on a traffic stop and to get consent to search the Malibu first. (*Id.*). If they could not obtain consent, then the plan was to pull Bruma out of the vehicle and "go that route." (*Id.*). While it is clear that officers wanted to search the Malibu—they even say that they have probable cause to do so—TFO Long and TFO Stuckey appear to be merely discussing how to proceed with the shimmer investigation. And although they discuss detaining Bruma, officers' conversations indicate that they were determining whether there was probable cause for such an action. The Court does not fault officers for planning their investigation and attempting to confirm or dispel their suspicion that Bruma was the suspect placing shimmers on the ATMs. That is the whole point of a *Terry* stop.

As for the other factors, there was no search of the vehicle until after TFO Stuckey made his identification at the end of the stop. It was only after Bruma was placed in handcuffs and left the scene that officers conducted an inventory search of the Malibu. (ECF No. 50 at 18). Nor was there much questioning of Bruma outside the typical questions asked during a traffic stop. TFO Long simply asked where Bruma was from and inquired into his travels that evening. Nor was there a show of force until TFO Long ordered Bruma out of the vehicle so that TFO Stuckey could make his identification. *See, e.g.*, *Pennsylvania v. Mimms*, 434 U.S. 106 (1977); *United States v. Johnson*, 170 F.3d 708, 716 (7th Cir. 1999) ("*Mimms* held that the police may order the driver out of her car after a lawful vehicle stop, even in the absence of reasonable suspicion that the driver is armed."). And there is no indication that Bruma was taken into custody before he was placed in handcuffs at the end of the stop. Although not free to leave, he sat in his vehicle until the end of the encounter.

Weighing the factors here, the Court finds the officers conduct to fall within the permissible scope of *Terry*. Nothing in the officers' actions lead the Court to believe that Bruma was under arrest as he sat in his vehicle. Instead, the officers were doing precisely what *Terry* authorizes: investigating. Bruma was not under arrest until he was placed in handcuffs, and his argument to the contrary is no basis for suppression.

### b. The Seizure was Not Unreasonably Prolonged.

Bruma next argues that the evidence from the stop should be suppressed because he was pulled over for a traffic infraction and, once the interdiction period for that offense ended, the seizure became unreasonable. (ECF No. 50). As the Supreme Court has explained, a "routine traffic stop" is a Fourth Amendment seizure akin to a *Terry* stop, and it may last no longer than is necessary to accomplish its purposes. *Rodriguez v. United States*, 575 U.S. 348, 354-55 (2015).

Once "tasks tied to the traffic infraction"—checking identifications, writing citations, and the like—have been completed, the purpose of a traffic stop has been fulfilled and a vehicle's occupants generally are free to go. *Id.* Indeed, authority for the seizure "ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* Under these principles, Bruma argues that the approximately 42-minute-long stop was constitutionally excessive, extending beyond the time necessary to prepare citations and check identifications.

What Bruma overlooks, however, is that this was not a "routine traffic stop" like that contemplated in *Rodriguez. Id.* A reasonable suspicion of illegal activity apart from the traffic violation will authorize a separate investigatory stop under *Terry. See United States v. Richardson*, 700 F. Supp. 2d 1040 (N.D. Ind. 2010) ("When an officer has reasonable suspicion that an occupant of the vehicle is engaged in illegal drug activity in addition to that which justified a traffic stop, the officer may prolong the stop to investigate that activity."). And when officers pulled over the Malibu, they had two bases for doing so. Officer Nystuen had probable cause to stop it for speeding and there was reasonable suspicion that the Malibu's driver engaged in criminal activity—placing shimmers. Indeed, TFO Long testified that Officer Nystuen's traffic stop investigation was going on at the same time as TFO Long and TFO Stuckey were attempting to determine whether Bruma was the suspect of the shimmer investigation. (ECF No. 48 at 39).

To that end, the Government asserts that there was reasonable suspicion based on the shimmer investigation to pull over the Malibu and that the 42-minute seizure was reasonable. The stop itself is reasonable if officers possess "well-founded suspicions that a person has been [or] is…engaged in criminal activity." *Bullock*, 632 F.3d at 1014-15. To be constitutional, a *Terry* stop, "must be reasonably related in scope and duration to the circumstances that justified the stop in the first place[.]" *Reedy*, 989 F.3d 548, 552 (7th Cir. 2021) (citing *United States v. Robinson*, 30

F.3d 774, 784 (7th Cir. 1994)). As for duration, "there is no rigid time limit placed on *Terry* stops." *United States v. Ruiz*, 785 F.3d 1134, 1143 (7th Cir. 2015). But when assessing the reasonableness of the investigative stop's duration, the Court should consider "whether the police diligently pursued a means of investigation likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *United States v. Sharpe*, 470 U.S. 675, 686 (1985). This is a highly fact-specific inquiry. *Reedy,* 989 F.3d at 553 (collecting cases).[3]

Although Officer Nystuen pulled Bruma over speeding,[4] law enforcement also reasonably suspected that the driver of the Malibu placed shimmers and cameras on the West Jefferson and Maplecrest Road ATMs on October 3, 2024. The male driver was the sole occupant. The surveillance footage at both locations shows the driver pulling up to the ATMs at both locations wearing a white t-shirt, dark sunglasses, and a hat with the Chicago flag on it. Officers collected the shimmers and cameras from the ATMs the same day.

The next day, law enforcement knew that the same Malibu would be coming from Chicago, Illinois to the Fort Wayne area. Surveillance officers tracked the Malibu as it entered Allen County on US 30—the driver again being the sole occupant. The Malibu immediately drove to the area where the West Jefferson ATM is located. From there, the Malibu traveled immediately to the

---

[3] "Compare *Rabin v. Flynn*, 725 F.3d 628, 633-35 (7th Cir. 2013) (concluding that a 90-minute *Terry* stop did not exceed scope or durational limits where officers were verifying the legitimacy of an individual's firearm license and the delay occurred for reasons outside of the officers' control); *Bullock*, 632 F.3d at 1015 (determining that a 30-to 40-minute detention while police executed a search warrant was reasonable when there was no indication that the officers unnecessarily prolonged the search); *United States v. Adamson*, 441 F.3d 513, 521 (7th Cir. 2006) (concluding that a 25-minute delay was reasonable to investigate whether an individual was taking part in drug activity in a motel room given the number of subjects and their reluctance to tell officers their names or why they were at the motel), and *United States v. Vega*, 72 F.3d 507, 515-16 (7th Cir. 1995) (determining that a 62-minute delay was reasonable given the defendant initially consented to a search of a garage but then changed his mind and a drug-sniffing dog was called to examine the defendant's car), with *Moya v. United States*, 761 F.2d 322, 326-27 (7th Cir. 1984) (applying *Place* and concluding that a three-hour detention of luggage was unreasonable where there was no explanation for why it took that long to transport the luggage from one terminal to another for drug testing)."

[4] *See United States v. Avila*, 615 F. Supp. 3d 846 (N.D. Ill. 2022), *aff'd*, 106 F.4th 684 (7th Cir. 2024) ("To pull over a vehicle, police do not have to suspect the crime of the century. Even a broke taillight or some other modest traffic infraction will do.").

Maplecrest Road ATM. The driver pulled up to the ATM, stayed for a short time, and then left the area. The Malibu made no other stops in Fort Wayne before heading eastbound on US 30 toward Chicago. Officers had eyes on the Malibu during its entire trip to Fort Wayne on October 4, 2023.

These facts supply the reasonable suspicion necessary for the *Terry* stop in relation to the shimmer investigation. Officers "may conduct an investigatory stop of a person when they have a reasonable, articulable suspicion that criminal activity is afoot." *Huff v. Reichert*, 744 F.3d 999, 1004 (7th Cir. 2014). The Malibu's driver placed the shimmers and cameras on West Jefferson and Maplecrest Road ATMs, drove to Chicago, returned to Fort Wayne the next day just to visit the same two ATMs, and then drove back toward Chicago. The Government asks, "are there no ATM machines in Chicago?" (ECF No. 60 at 19). There are. *See United States v. Hagenow,* 423 F.3d 638, 642 (7th Cir. 2005) ("Ultimately, a court's determination of reasonable suspicion must be based on common-sense judgments and inferences about human behavior."). Officers reasonably suspected that the Malibu's driver was involved in criminal activity and they were constitutionally permitted to confirm or dispel that suspicion.

As for the duration of the stop, that too was reasonable. TFO Long's body camera footage makes clear that law enforcement worked diligently to determine whether Bruma was the individual seen in the surveillance images from the West Jefferson ATM. When TFO Long arrived at the scene, he immediately asked Bruma about his travels that evening. *See United States v. Cole*, 21 F.4th 421 (7th Cir. 2021) ("The Constitution allows an officer to ask [travel-plan and itinerary] questions during a traffic stop, especially when the answers objectively seem suspicious."). Bruma lied. *See United States v. Ruiz*, 785 F.3d 1134, 1143 (7th Cir. 2015) ("[A] defendant's actions can contribute to a permissible extension of a stop," including when a defendant gives problematic responses to lawful questions that "increased rather than allayed the officers' suspicions."). From

14

there, TFO Long and TFO Stuckey had several conversations about Bruma and the person depicted in the surveillance video. They discussed at length what Bruma was wearing and what he looked like, comparing TFO Long's description of Bruma with the surveillance images. Meanwhile, Officer Nystuen tried to verify Bruma's identification and confirm that Bruma was in rightful possession of the Malibu with the rental company. TFO Stuckey even called an AUSA to get her opinion. If anything, the fact that she was unsure how to proceed indicates that officers were still trying to confirm or dispel their reasonable suspicions.

After receiving confirmation that Bruma rightfully possessed the Malibu, Officer Nystuen issued the traffic citations to Bruma approximately 38 minutes into the stop. At that point, TFO Stuckey had yet to see Bruma. TFO Long and TFO Stuckey again looked at the photographs from the West Jefferson ATM's surveillance footage. About 2 minutes after the citation was issued, TFO Long returned to the Malibu and ordered Bruma out of the vehicle. Bruma met TFO Stuckey and Bruma was arrested quickly after.

The fact that the traffic stop ended before Bruma was arrested is not fatal to the Government's argument. There were simultaneous investigations here. Officer Nystuen had probable cause to stop Bruma based on a traffic violation. But, to reiterate, law enforcement also had reasonable suspicion that the Malibu's driver placed the shimmers and cameras on the ATMs the night before. Even though the investigation regarding Bruma's traffic violation ended, officers were still confirming or dispelling their suspicions as to the shimmer investigation. TFO Long pulled Bruma out of the Malibu just two minutes after the traffic stop ended and TFO Stuckey's identification confirmed that suspicion. All told, officers worked diligently to determine whether Bruma was the suspect from the surveillance footage. Based on the circumstances here, the duration of the stop was reasonable.

### c. Officers had Probable Cause to Arrest Bruma

Lastly, Bruma contends that officer lacked probable cause to arrest him at the end of the stop. "Probable cause depends on the totality of the circumstances." *Esco v. City of Chi.*, 107 F.4th 673, 682 (7th Cir. 2024) (citing *Maryland v. Pringle*, 540 U.S. 366, 371, 124 S. Ct. 795, 157 L. Ed. 2d 769 (2003)). "To determine whether an officer had probable cause to arrest an individual, we examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause[.]" *Pringle,* 540 U.S. at 371 (citation and quotation omitted). Probable cause exists "if at the time of arrest the facts and circumstances within the arresting officer's knowledge and of which [he] has reasonably trustworthy information would warrant a prudent person in believing that the suspect had committed or was committing an offense." *Spiegel v. Cortese*, 196 F.3d 717, 723 (7th Cir. 1999) (citations and internal quotations omitted).

When TFO Long approached Bruma at the outset of the stop and asked him about his travels that evening, Bruma lied. Although he said he was visiting friends in Ohio, officers had been following him all night in Fort Wayne. Bruma was driving the same Malibu bearing the same license plate as the suspect that placed the shimmers on the West Jefferson and Maplecrest Road ATMs the night before. And it appears he came to Fort Wayne just to visit same two ATMs before heading back toward Chicago.

At minimum, TFO Stuckey saw the surveillance footage from the West Jefferson ATM from the night before. Although the suspect at the ATM was wearing a mask which covered his face and dark sunglasses, he was wearing a white t-shirt and a hat with the Chicago flag on it. TFO Long had trouble determining whether the hat had the Chicago flag on it, but his description of the hat was the same as that of the suspect. When TFO Long first approached TFO Stuckey, he said,

"it looks like him." Based on the surveillance images, the Court agrees. Further, TFO Stuckey spent much time comparing TFO Long's description of Bruma to the surveillance images. Once TFO Stuckey finally saw Bruma at the end of the stop, he was confident that Bruma was the suspect that placed the shimmers the night before. (ECF No. 48, Exhibit 15 at 39:45-40:00 ("Yeah, that's him. That's good enough.")). All told, there was probable cause to believe that Bruma "had committed or was committing an offense." *Spiegel*, 196 F.3d at 723.

The Court can easily dispose of Bruma's arguments to the contrary. First, Bruma appears to argue that he does not resemble the suspect based on a brief discussion between TFO Stuckey and TFO Long. During the investigation, TFO Stuckey and TFO Long discussed whether Bruma has a tattoo on his arm based on the still images from the surveillance videos. (ECF No. 48, Exhibit 15 at 34:21-36:00). During the conversation, TFO Long mentioned how it is hard to tell from the still photographs because the image was "grainy." (*Id.*). TFO Long even says that it could be the suspect's hair piled up. (*Id.*). And he discussed how it appears that the suspect has a "spot between his eyes." (*Id.*). Indeed, Bruma does not have a tattoo on his arm or a dot between his eyes. But, as Bruma's brief concedes, officers were looking at the images on a cell phone at night—not exactly an ideal condition examining the stills. And all of this occurred before TFO Stuckey made his identification of Bruma. From the images, Bruma bears more than a vague resemblance to the suspect even if the suspect had on glasses and a mask covering his mouth. TFO Stuckey's identification remains reasonable. And this conversation does not wish away the fact that Bruma lied about his travels, was driving the same Malibu as the suspect, and visited the same two ATMs as the suspect just a day later.

Bruma also emphasizes the fact that the AUSA about halfway into the stop was unsure how to proceed. But, again, the AUSA was not present at the scene. And Courts do not analyze probable

cause from the view of an AUSA who was not even present at the stop. Rather, "we examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause[.]" *Pringle,* 540 U.S. at 371. Her opinion does not thwart the on-scene officers' probable cause determination. Nor does anything the AUSA or officers said after Bruma's arrest influence the Court's analysis. *See Spiegel*, 196 F.3d at 723 ("The existence of probable cause turns on the information known to the officers at the moment the arrest is made, not on subsequently received information.").

When viewing some events from the stop in isolation, it may raise eyebrows. Yet that is not how courts review probable cause. Probable cause is itself "a commonsense determination," *Tangwall v. Stuckey,* 135 F.3d 510, 519 (7th Cir. 1998), that accounts for all the circumstances leading up to the arrest. *See Esco*, 107 F.4th at 682. Bruma was driving the same Malibu as the suspect, came to Fort Wayne just to visit the same ATMs as the suspect, lied about his travels, and resembled the suspect. If that were not enough, TFO Stuckey's identification was the nail in the probable cause coffin. The Court is confident that an objectively reasonable officer would have found the same and that probable cause existed for Bruma's arrest.

## CONCLUSION

For these reasons, Defendant's Motion to Suppress (ECF No. 32) is DENIED. A scheduling order will issue by separate entry.

SO ORDERED on November 12, 2024.

                                                      s/ *Holly A. Brady*
                                                      CHIEF JUDGE HOLLY A. BRADY
                                                      UNITED STATES DISTRICT COURT